IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICHARD J. SINGLETON,

    Plaintiff,

       v.

 

NORFOLK SOUTHERN RAILWAY
COMPANY, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:19-CV-3133-TWT

## OPINION AND ORDER

This is an employment discrimination case. It is before the Court on the Defendants' Motion for Partial Summary Judgment [Doc. 87]. For the reasons set forth below, the Defendants' Motion for Partial Summary Judgment [Doc. 87] is GRANTED in part and DENIED in part.

### I.    Background

This case arises out of alleged employment retaliation which the Plaintiff Richard J. Singleton suffered while working for Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "Norfolk Southern"). Singleton completed his student carman training in October 1998 and spent most of his career—until December 2020—as a carman at Norfolk Southern's Brosnan Yard in Macon, Georgia. (Defs.' Statement of Undisputed Material Facts ¶ 1.) Defendants Cortez Mason, Jonathan Henson, and Steven Moose overlapped with Singleton there, in relevant part, between

2016 and 2018: Henson as a general foreman, and Mason and Moose as senior general foremen. (*Id.* ¶¶ 3-5.)

In July 2016, Singleton was working on the wheel truck at Brosnan Yard, which made him responsible for derailments, train-related delays on the main line, and customers who needed help with a railcar or box car. (*Id.* ¶ 2.) He reported a work-related injury to his left shoulder on July 28, 2016, after he attempted to open a covered hopper car discharge door with a pry bar. (*Id.* ¶ 9; Pl.'s Statement of Undisputed Material Facts ¶ 8.) Due to his injury, Singleton was out of work until July 26, 2017. (Defs.' Statement of Undisputed Material Facts ¶ 19.) While he was on leave, Norfolk Southern made two modifications to the wheel truck position: first, it reduced the number of CDL-certified carmen assigned to the wheel truck from two to one, and second, it changed the rest days from Saturday and Sunday to one weekend day and one weekday. (*Id.* ¶¶ 27-28.) Singleton's two-man wheel truck job was abolished on August 9, 2016—less than two weeks after he reported his injury. (Pl.'s Statement of Undisputed Material Facts ¶ 21.)

According to the Defendants, Norfolk Southern began studying the efficiency of carmen at various railyards, including Brosnan Yard, in May 2016. (Defs.' Statement of Undisputed Material Facts ¶ 25.) The Defendants claim that Brosnan Yard lacked sufficient manpower to serve customers on weekends since two CDL-certified carmen were then operating the wheel

truck. (*Id.* ¶ 26.) Norfolk Southern's solution, the Defendants continue, was to make the wheel truck position a single-man job with staggered rest days. (*Id.* ¶ 27.) Singleton, however, disputes this stated rationale for the staffing decision. Prior to the changes, Singleton worked on the wheel truck with another carman named Steve Garrett. (*Id.* ¶ 30.) Garrett attests that on August 8, 2016, Mason informed him that his and Singleton's jobs were being abolished because they could not "work safe." (Pl.'s Statement of Undisputed Material Facts ¶ 22.) Garrett states that he declined to bid on the new wheel truck position for safety reasons; he was concerned about the prospect of completing tasks with a junior carman rather than with another CDL-certified carman. (Garrett Decl. at 2-3.)

On or around January 13, 2017, Singleton filed a complaint with the Occupational Safety and Health Administration ("OSHA") alleging that Norfolk Southern eliminated his job in retaliation for making an injury report. (Defs.' Statement of Undisputed Material Facts ¶ 46; Pl.'s Statement of Undisputed Material Facts ¶ 28.) Still, when he returned to work in July 2017, Singleton chose to bid into the new wheel truck job. (Defs.' Statement of Undisputed Material Facts ¶ 33.) As long as he held that role, there were no changes in his job duties, pay, or benefits; he did not suffer any workplace injuries; and he was not threatened with any discipline by Mason. (*Id.* ¶¶ 34-38.) Like Garrett, though, Singleton testified that he felt unsafe being

sent out on wheel truck assignments alone. (Pl.'s Statement of Undisputed Material Facts ¶ 30.) Singleton alleges that when he expressed those concerns to Mason, Mason told him to quit if he did not like the work. (*Id.*) Singleton's union also filed a grievance with Norfolk Southern on or around December 8, 2017, regarding the change in his rest days. (Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 31.) Shortly thereafter, on January 3, 2018, Norfolk Southern abolished the wheel truck position altogether. (Pl.'s Statement of Undisputed Material Facts ¶ 32.) This decision cost Singleton his "torch pay," which is the supplemental income that wheel truck workers earn for performing welding repairs. (Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 34.)

In January 2018, Singleton transitioned into a general carman role at Brosnan Yard, performing inspections and air brake tests on outbound trains. (Pl.'s Statement of Undisputed Material Facts ¶¶ 37, 44.) When an inspector finds a defect in a railcar, he places a bad order tag on the car, and if necessary, the car is pulled out of the train for repair, potentially causing a delay. (Defs.' Resp. to Pl.'s Statement. of Undisputed Material Facts ¶¶ 45-46.) During his deposition, Singleton testified that his supervisors, Henson and Moose, instructed him not to perform a full and complete inspection on outbound cars; rather, Singleton was only supposed to check for brake and hump damage. (Singleton Dep. of Dec. 16, 2021, at 9:17-10:1; Defs.' Statement of Undisputed

Material Facts ¶ 50.) According to Singleton, this instruction contradicted what he had been told by all other Norfolk Southern supervisors. (Singleton Dep. of Dec. 16, 2021, at 10:2-20.) It also contradicted Singleton's understanding of his job description and federal regulations. (Singleton Dep. of Dec. 9, 2021, at 84:22-87:7.)

Singleton asserts that Henson frequently harassed, threatened, and cursed him over his inspection process. (Pl.'s Statement of Undisputed Material Facts ¶ 39.) For example, on January 28, 2018, Singleton states that Henson hassled him for bad ordering several cars that, in Henson's view, should not have been inspected at all. (Singleton Dep. of Dec. 9, 2021, at 105:4-106:2.) And on February 27, 2018, Henson again disputed a bad order tag that Singleton had placed on a suspected cracked coupler. (Pl.'s Statement of Undisputed Material Facts ¶¶ 51-52.) As Singleton recalls, Henson aggressively tried to convince Singleton to remove the tag. He used a Norfolk Southern bulletin, MDI-0021-GEN, published on December 22, 2017, to show Singleton the differences between cracked couplers and hot tears.[1] (Defs.' Statement of Undisputed Material Facts ¶ 61.) According to Singleton, Henson

---

[1] Hot tears are casting flaws created during the manufacturing process; they generally do not grow or change over time and thus do not need to be removed from a train. (Defs.' Statement of Undisputed Material Fact ¶ 54.) Cracked couplers, on the other hand, are not present at the time of casting but are created by loads experienced during service; as a result, cracks are likely to grow over time. (*Id.*)

then threatened to fire or discipline him if he did not pull the tag. (Pl.'s Statement of Undisputed Material Facts ¶ 53.) Singleton complied, although he also contacted the Federal Railroad Administration ("FRA") to report the coupler. (*Id.* ¶ 54.) When the FRA inspected that car some unknown time later, it found that the coupler in question was broken and ordered it repaired. (Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 54.)

On March 7, 2018, Singleton performed an outbound inspection on a train and took no exceptions to any of its cars. (Pl.'s Statement of Undisputed Material Facts ¶ 56.) The next day, an FRA inspector conducted a routine check of Norfolk Southern's equipment and identified a total of 18 unreported defects. (Defs.' Statement of Undisputed Material Facts ¶¶ 73-74.) For one defect—a broken ladder tread—the inspector recommended assessing a violation and $5,000 fine against Norfolk Southern. (*Id.* ¶¶ 74-75.) Singleton had inspected the car with the broken ladder tread. (*Id.* ¶ 77.) However, Singleton contends that after his inspection, the car at issue had been "off air" for more than 24 hours, had been moved, and thus had to be reinspected. (Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 76.) In fact, Singleton asserts that another carman, James Davis, did inspect the car—or at least its brakes—after him. (*Id.* ¶ 76; Singleton Dep. of Dec. 16, 2021, at 30:6-31:10.)

Even so, on March 10, 2018, Moose and Division Manager Mechanical Operations Dianne Barnett cited Singleton for failing to properly identify

6

defective or missing safety equipment. (Defs.' Statement of Undisputed Material Facts ¶ 80.) For the offense, Singleton received a START serious discipline with a deferred five-day suspension. (Pl.'s Statement of Undisputed Material Facts ¶ 62.) He and his union representative, Lewis Smith, signed a form agreeing to the discipline and waiving his right to contest the charge through a hearing. (Singleton Dep. of Dec. 16, 2021, at 48:24-49:11.) According to Singleton, he accepted the charge not because he agreed with it but because he did not want to risk being suspended or fired pending an investigation, hearing, and possible appeal. (*Id.* at 49:16-51:8.) One day earlier, Henson had gone to the carmen gang leader's office asking about the cars that were bad ordered by the FRA. (Pl.'s Statement of Undisputed Material Facts ¶ 64.) Sean Collins was the gang leader on duty at the time; when Henson learned that Singleton had checked the car with the broken ladder tread, Collins states, Henson grinned and said, "The word of the day is 'karma.'" (Collins Decl. at 1-2.) Collins avers that Henson did not seek any information regarding the other bad-ordered cars or the carmen who had inspected them. (Collins Decl. at 2.)

On April 10, 2018, Singleton bad ordered a car for having a cracked coupler. (Pl.'s Statement of Undisputed Material Facts ¶ 66.) Upon inspection, Henson disagreed that the coupler was cracked, and the two men got into what Singleton described as a "knock-out drag-out [fight] in the yard." (*Id.* ¶ 67.)

According to Singleton, Henson was threatening to fire him, cursing him, and becoming more and more aggressive as Singleton refused to remove the tag. (*Id.* ¶ 68.) For his part, Henson denies that there was any confrontation, although he admits to warning Singleton that he could be disciplined if the bad order was incorrect. (Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 68.) Singleton testified that three other carmen also looked at the coupler in question and agreed with him that it needed to be bad ordered. (Pl.'s Statement of Undisputed Material Facts ¶ 69.) Barnett, however, testified that two FRA inspectors came to the same conclusion as Henson that there was no defect. (Defs.' Statement of Undisputed Material Facts ¶ 94.) Moose and Barnett assessed discipline against Singleton for failing to follow bulletin MDI-0021-GEN, handing down a 30-day suspension without pay (with 20 days deferred). (*Id.* ¶ 95.) Again, Singleton and his union representative accepted the discipline while waiving his right to challenge the charge at a hearing. (*Id.* ¶ 97.) Based on the above incidents, Singleton filed multiple additional retaliation complaints against Norfolk Southern, Mason, Moose, and Henson with OSHA; the agency dismissed all of them. (*Id.* ¶ 101.)

## II.   Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter

8

of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

### III.   Discussion

#### A.  Legal Framework

The purpose of the Federal Rail Safety Act ("FRSA") is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Consistent with these goals, Congress amended the statute in 2007 to expand the scope of anti-retaliation protections available to railroad employees. *See Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3d Cir. 2013). The 2007 amendments were designed to "enhance administrative and civil remedies for employees and to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers." *Norfolk S. Ry. Co. v. Solis*, 915 F. Supp. 2d 32, 44 (D.D.C. 2013) (quotation marks, citation, and alteration omitted). Under the amended version of the FRSA, a railroad carrier "may not

discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to" a protected activity undertaken by the employee. 49 U.S.C. § 20109(a). The statute designates several protected activities such as informing a railroad of a work-related injury, reporting a hazardous safety condition, and refusing to assist in the violation of a federal safety rule. *Id.* § 20109(a)(1), (b)(1).

To establish a retaliation claim under the FRSA, an employee must meet the two-part burden-shifting test set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (the "AIR-21"). *Id.* § 20109(d)(2)(A); *see Araujo*, 708 F.3d at 157. First, the employee must show by a preponderance of the evidence that "(1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Araujo*, 708 F.3d at 157 (citation omitted); *see also Shearrer v. Norfolk S. Ry. Co.*, 2021 WL 871356, at *4 (N.D. Ala. Mar. 8, 2021) (noting that district courts in the Eleventh Circuit analyze FRSA retaliation claims under the four-element test established in *Araujo*). Once the employee makes this prima facie showing, the burden shifts to the employer to demonstrate by clear and convincing evidence that it would have taken the same unfavorable personnel action absent the protected activity. *See Araujo*, 708 F.3d at 157.

10

Courts use the standard articulated in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2005), to determine whether there has been an unfavorable personnel action. *See, e.g.*, *Stapleton v. CSX Transp., Inc.*, 530 F. Supp. 3d 1128, 1143, 1145-46 (M.D. Fla. 2021); *Shearrer*, 2021 WL 871356, at *5. There, the Supreme Court addressed the scope of employer retaliation that is actionable under Title VII of the Civil Rights Act of 1964. *See Burlington*, 548 U.S. at 57. The Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citation omitted). Adapted to the FRSA, a materially adverse employment action is one which might dissuade a reasonable worker from engaging in statutorily protected activity. *See Stapleton*, 530 F. Supp. 3d at 1143; *Sirois v. Long Island R.R. Co.*, 2018 WL 8963528, at *3 (E.D.N.Y. Aug. 24, 2018).

Of course, an adverse employment action is not considered retaliation unless the employee can show that her protected activity was a contributing factor in the employer's decision. A contributing factor refers to "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Araujo*, 708 F.3d at 158 (citation and emphasis omitted); *see also Consolidated Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x

11

334, 338 (6th Cir. 2014). This standard is "broad and forgiving"; it "was intended to overrule existing case law, which required a whistleblower to prove that his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action." *BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 639 (10th Cir. 2016) (citation and alteration omitted). Indeed, the Supreme Court has interpreted similar language to create liability if an employee's conduct causes "even the slightest" influence on her employer's decision. *Yowell v. Admin. Review Bd., U.S. Dep't of Labor*, 993 F.3d 418, 424 (5th Cir. 2021) (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692, 695-99 (2011)). This inquiry should take into account the employer's retaliatory *as well as* nonretaliatory reasons. *See Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017).

The parties dispute whether retaliatory intent is a required showing under the contributing factor standard. According to the Defendants, "appellate courts in other jurisdictions have concluded that FRSA plaintiffs— like retaliation plaintiffs under Title VII and other anti-retaliation statutes— must demonstrate intent to retaliate to state a claim." (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 4.) Singleton stakes out the opposite position. Citing *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), he urges the Court to adopt a but-for causation standard that asks only whether the employer intended the discriminatory conduct at issue, regardless of any underlying

12

subjective motives. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 21-22.) As the Fifth Circuit framed it in *Epple v. BNSF Railway Co.*, 785 F. App'x 219, 222-23 (5th Cir. 2019), the question is whether "the contributing factor language altered the amount of evidence needed to establish a claim under the FRSA" or "jettison[ed] the scienter requirement altogether." For the reasons stated below, the Court agrees with the Defendants that some proof of retaliatory animus is needed to succeed on an FRSA claim.

Although this question remains unresolved in the Eleventh Circuit, it has caused a split among other circuit courts of appeals. Singleton finds support for his interpretation from the Third and Ninth Circuits. In *Araujo*, the Third Circuit advised that "an employee '*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action.'" *Araujo*, 708 F.3d at 159 (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)). The Ninth Circuit expanded on the Third Circuit's cursory analysis in *Frost v. BNSF Railway Co.*, 914 F.3d 1189, 1195 (9th Cir. 2019). As the Ninth Circuit reads the statute:

> [A]lthough intent or animus is part of an FRSA plaintiff's case, showing that [the] plaintiff's protected conduct was a contributing factor is the required showing of intent or "intentional retaliation." That is, by proving that an employee's protected activity contributed in some way to the employer's adverse conduct, the FRSA plaintiff has proven that the employer acted

with some level of retaliatory intent.

*Frost*, 914 F.3d at 1196 (citation and alteration omitted). Whether the employer possessed subjective animus, the court concluded, is irrelevant to the employee's prima facie case. *See id.* at 1195.

Outside the Third and Ninth Circuits, though, the weight of authorities tips in the Defendants' favor. The Second, Seventh, and Eighth Circuits expressly require some evidence of retaliatory intent to maintain an FRSA claim, *see Tompkins v. Metro-N. Commuter R.R. Co.*, 983 F.3d 74, 82 (2d Cir. 2020); *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381-82 (7th Cir. 2018); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014), while the Fourth and Sixth Circuits have implicitly endorsed the same approach. *See Lowery v. CSX Transp., Inc.*, 690 F. App'x 98, 100-01 (4th Cir. 2017) (denying the employer's request for summary judgment where the evidence supported an inference of retaliatory animus); *Consolidated Rail*, 567 F. App'x at 338 (finding "substantial evidence that animus was a contributing factor in [the employee's] termination"). In *Armstrong*, the Seventh Circuit reasoned:

> The [FRSA] prohibits intentional discrimination in response to an employee's performance of a protected activity. *See* 49 U.S.C. § 20109(a) (a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way *discriminate* against an employee") (emphasis added). "[T]he essence of this intentional tort is discriminatory animus." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (internal quotation marks and citation omitted). That is to say, an employer violates the statute only if the adverse employment action is, at some level, *motivated* by discriminatory animus.

14

It is true that to make a prima facie case, a plaintiff is not required to conclusively demonstrate that retaliation was the only—or even main—motivation. *Id.* (citing *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010)). That does not mean, however, that a plaintiff is not required to show that retaliation played at least some role in the decision. *Id.* (noting that "contributing factor" is a more lenient standard, but explaining that "the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in a protected activity"). A showing of discriminatory animus, which the statute requires, necessarily includes some proof of retaliatory motive.

*Armstrong*, 880 F.3d at 382. The Eleventh Circuit has described the AIR-21's analogous retaliation framework in similar terms. In *Majali v. U.S. Department of Labor*, 294 F. App'x 562 (11th Cir. 2008), the court explained that statutory protections apply "if a *retaliatory motive* tends to affect in any way the outcome of the decision to take an adverse action against an employee." *Majali*, 294 F. App'x at 566 (emphasis added) (quotation marks and citation omitted).

Several kinds of evidence may be used to demonstrate retaliatory intent. In *Tompkins*, the Second Circuit stressed that an FRSA plaintiff must "show more than a temporal connection between the protected conduct and the adverse employment action to present a genuine factual issue on retaliation." *Tompkins*, 983 F.3d at 82 (quotation marks, citation, and alteration omitted); *see also Kuduk*, 768 F.3d at 792 (same). Echoing an earlier Eighth Circuit decision, the court identified five factors to guide the contributing factor analysis: (1) whether and to what extent the disciplinary measures were

related to the protected activity, (2) the temporal relationship between the protected activity and the disciplinary measures, including whether any intervening incidents occurred that could independently justify the discipline, (3) whether the disciplined employee was represented by counsel or a similar representative in the disciplinary proceedings, and whether the disciplinary measures were upheld on appeal, (4) whether, if applicable, the disciplinary measures were upheld following Department of Labor proceedings, and (5) whether the persons accused of hostility towards the employee's protected activity participated in the disciplinary decision. *See Tompkins*, 983 F.3d at 82-83. Other relevant factors include indications of pretext, inconsistent application of an employer's policies, an employer's shifting or false explanations for its actions, and a change in an employer's attitude toward the employee following her protected activity. *See Sirois v. Long Island R.R. Co.*, 797 F. App'x 56, 59-60 (2d Cir. 2020).

## B. Singleton's Prima Facie Case

Using the legal framework and principles outlined above, the Court now considers whether Singleton has established a prima facie case of unlawful retaliation. Between the Complaint and his response brief, Singleton alleges that the Defendants took five adverse personnel actions against him: (1) changing the rest days and number of employees assigned to the wheel truck position in August 2016, (2) abolishing the wheel truck position

altogether in January 2018, (3) harassing and threatening to fire him beginning in January 2018, (4) disciplining him for missing a broken ladder tread in March 2018, and (5) disciplining him for bad ordering a non-defective coupler in April 2018.[2] (Compl. ¶¶ 26-28, 36-37, 43-45, 49, 57-58, 66-67, 69; Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 11-12, 14, 16-20, 24-25.) The Defendants attempt to undermine Singleton's case in three ways. First, they argue that on the evidentiary record before the Court, Singleton cannot make out the adverse action or contributing factor elements of his claim. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 6-15.) Second, regarding the March and April 2018 incidents, the Defendants argue that the time elapsed from Singleton's injury report and OSHA complaint severs any possible causal connection with his disciplinary suspensions. (*Id.* at 15-17.) And finally, the Defendants claim that when Singleton bad ordered cracked couplers in February and April 2018, he was not acting in good faith and thus is not protected by the FRSA. (*Id.* at 17-19.)

### 1.  Changes in the Wheel Truck Position

First, the Defendants insist that their changes to the wheel truck position were not an adverse action. Citing Singleton's deposition testimony,

---

[2] To the extent that Singleton previously claimed that Norfolk Southern denied or delayed medical care related to his injury, that claim has been abandoned. (Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 2.)

the Defendants emphasize that after his shoulder surgery, Singleton was able to return to the same job and receive the same salary and benefits as he did before his injury. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 9 (citing Singleton Dep. of Dec. 9, 2021, at 37:13-39:22).) The sole differences, the parties agree, were that (1) Singleton no longer had a full weekend off each week but had one weekday and one weekend day off and (2) Singleton had to perform the job alone rather than with another CDL-certified carman. (*Id.*; Pl.'s Br. in Opp'n to Defs.' Mot. For Summ. J., at 11-12.) As to the contributing factor element, the Defendants claim that Norfolk Southern had been evaluating these changes for months before Singleton was injured. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 9-10.) So, the argument goes, Singleton's injury report had nothing to do with the company's later staffing decision.

In response, Singleton presents evidence that the job changes could indeed be considered adverse. Garrett, Singleton's former partner on the wheel truck, attested in a declaration that "[l]osing a Saturday/Sunday off days job is certainly a bad thing to happen to a carman." (Garrett Decl. at 3.) According to Garrett, carmen like Singleton "work a whole career waiting to be eligible for Saturday/Sunday off." (*Id.*) Garrett also alleges that he chose not to bid on the new wheel truck position due to safety concerns; since it had been reduced to a one-person job, Garrett worried that an inexperienced junior carman would

18

be called to assist him on wheel truck assignments. (*Id.* at 2-3.) Echoing Garrett's concerns, Singleton testified that when he resumed the job, he found that the duties and requirements had not changed even though the manpower had been halved. (Singleton Dep. of Dec. 9, 2021, at 41:13-22.) He felt unsafe being sent out to complete tasks alone and voiced those concerns to Mason on multiple occasions as well as his union leadership. (*Id.* at 41:23-43:3.) Taken together, this evidence creates a fact issue as to whether the changes in the wheel truck position were materially adverse: that is, whether the changes might dissuade a reasonable worker from reporting a work-related injury, as Singleton had.

The Court also concludes that Singleton has raised a fact issue as to whether his injury report was a contributing factor in Norfolk Southern's staffing decision. First, there is the temporal evidence: Singleton told a supervisor about his injury on July 28, 2016, and the two-man wheel truck position was abolished just 12 days later on August 9, 2016. (Singleton Dep. of Dec. 9, 2021, at 24:8-14.) *Cf. Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding, in the Title VII context, that "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action"). Next, there is the conversation that Garrett had with Mason a few days after Singleton's accident. According to Garrett, Mason stated that "he was going to abolish

19

[Singleton's and Garrett's] wheel truck jobs because [they] could not 'work safe'"; Garrett interpreted that as a reference to Singleton's recent injury. (Garrett Decl. at 2.) For summary judgment purposes, this evidence is sufficient to rebut the time studies which the Defendants claim were the actual impetus for the staffing changes.[3]

Finally, the Defendants argue that the Railway Labor Act ("RLA") preempts any grievances that Singleton may have with the process for abolishing and re-bulletining the wheel truck position. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 10-11.) According to the Defendants, that process is dictated by the collective bargaining agreement between Norfolk Southern and Singleton's union, and federal courts do not have original jurisdiction to hear claims for alleged violations of a collective bargaining agreement. (*Id.* at 10 (citing, e.g., *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711 (1945)).) But as set forth in the Complaint, Singleton's retaliation claim does not seek to

---

[3] As evidence of Norfolk Southern's time studies, the Defendants offer six emails from David Price, a mechanical operations manager, to Mason dated April 13, 2016; May 18, 2016; June 15, 2016; July 20, 2016; August 10, 2016; and August 24, 2016. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., Ex. N at NS000016, NS000040, NS000064, NS000086, NS000108, NS000129.) Attached to each email are a series of graphs that compare the "straight time daily hours" on Monday through Friday with those on Saturday through Sunday at several Norfolk Southern yards, including Brosnan Yard. Neither the graphs nor the emails mention inefficiencies in the Macon wheel truck position or a need to create seven-day coverage at that position. Although Mason cited vague time studies during his deposition, he never connected those studies to the emails that he received from Price. (Mason Dep. at 144:4-145:10.)

interpret or enforce any provision in his collective bargaining agreement. The Court thus concludes that the RLA and its dispute resolution procedures are irrelevant to this case.

### 2. Abolishment of the Wheel Truck Position

Next, the Defendants argue that Norfolk Southern's decision to abolish the wheel truck position outright in January 2018 was not retaliation against Singleton. (Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 5.) The evidence, they maintain, "clearly shows that [Norfolk Southern] was actively studying the workforce and eliminated numerous jobs in the Brosnan Yard between August 2016 and December 2020." (*Id.*)

As an initial matter, the Defendants do not dispute that eliminating the wheel truck position was an adverse employment action. After all, not only was Singleton required to transfer into a new role as a general carman, but he also lost access to supplemental pay for making wheel truck repairs. (Singleton Dep. of Dec. 9, 2021, at 56:25-58:19.) Second, in the Court's view, Singleton has done enough to survive summary judgment on the contributing factor element of his claim. The evidence shows that Singleton's union filed a grievance seeking to reinstate his weekend rest days, which Barnett's office stamped as received on December 19, 2017. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., Ex. O at 1.) His job was then abolished about two weeks later on January 3, 2018. (Singleton Dep. of Dec. 9, 2021, at 43:21-44:7.) Also, Singleton testified

that he repeatedly objected on safety grounds to handling wheel truck assignments alone but that Mason ignored his concerns, sometimes responding that he could quit "if [he] didn't like it[.]" (*Id.* at 42:1-43:3.) Viewed in the light most favorable to Singleton, this evidence suggests that there was some retaliatory intent in the decision to abolish the wheel truck position, precluding summary judgment for the Defendants. *See Lowery*, 690 F. App'x at 100-01 (reversing summary judgment for the railroad company where deposition testimony showed that local managers were displeased with the plaintiff's safety reports).

### 3.  Harassment and Threats from Norfolk Southern Supervisors

Singleton claims that as a carman, he was routinely threatened and bullied by supervisors into overlooking safety defects during outbound inspections. According to Singleton, Henson in particular would berate him, threaten to fire or discipline him, and harass him into removing bad order tags to avoid train delays. (Singleton Dep. of Dec. 9, 2021, at 72:9-20, 74:11-75:6.) In support, Singleton highlights two incidents in January and February 2018 when Henson argued with him over reporting cars that Singleton believed posed safety risks. (Singleton Dep. of Dec. 9, 2021, at 104:2-105:17; Singleton Dep. of Dec. 16, 2021, at 6:20-8:11.) Even accepted as true, the Defendants argue that Henson's behavior is not actionable under the FRSA because Singleton was not disciplined in either instance. (Defs.' Br. in Supp. of Defs.'

Mot. for Summ. J., at 11.) Singleton's "subjective feeling" that his job was in peril, the Defendants reason, cannot be the basis for an adverse action. (Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 6-7.)

But what the Defendants downplay as a subjective feeling was, Singleton testified, based on express warnings that Singleton would be fired if he did not pull bad order tags. (Singleton Dep. of Dec. 9, 2021, at 87:13-88:13.) The Defendants cite no authority that such unequivocal warnings cannot, as a matter of law, dissuade a reasonable worker from engaging in protected activity. To the contrary, FRSA regulations specifically define retaliation to include "intimidating," "threatening," or "coercing" an employee for reporting a hazardous safety condition in good faith. 29 C.F.R. § 1982.102(b)(2). According to his deposition testimony, Singleton believed that federal regulations required him to perform complete inspections and bad order faulty cars no matter Henson's instructions. (Singleton Dep. of Dec. 9, 2021, at 84:22-87:4.) Indeed, multiple district courts have recognized that the kind of firing threats described by Singleton may give rise to a retaliation claim. *See, e.g.*, *Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 903 (D. Minn. 2015) (distinguishing implicit threats of discipline, such as an investigation into a suspected rule violation, from explicit warnings that the railroad will take action against an employee if she engages in protected activity); *Almendarez v. BNSF Ry. Co.*, 2014 WL 931530, at *5-6 (W.D. Wash. Mar. 10, 2014) (finding

23

a triable issue as to whether a railroad supervisor threatened to abolish the plaintiffs' jobs for reporting work-related injuries, in violation of the FRSA). The Court thus denies summary judgment on this aspect of Singleton's case.

### 4.  March and April 2018 Rule Violations

Singleton was disciplined for rule violations in March and April 2018, but the Defendants argue that he cannot claim an adverse action since he admitted wrongdoing each time. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 11-12; Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 9-10.) In response, Singleton claims that he felt pressure to accept the charges even though he did not agree with them. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 19.) During his deposition, Singleton explained that if he had contested the charges, he could have been taken out of service pending an investigation and hearing. (Singleton Dep. of Dec. 16, 2021, at 49:4-50:1.) If he were found at fault, he feared that Norfolk Southern could terminate him, leaving him unemployed during an administrative appeal that could take up to two years. (*Id.* at 50:2-6.) Weighing his options, Singleton decided that the better course of action was to waive his right to a hearing and continue earning a paycheck for the sake of his family. (*Id.* at 50:7-15, 76:20-77:21.) The Defendants offer no authority for the proposition that an employee must contest a rule violation with his employer to maintain a later retaliation claim. Lacking proper citation, the Court cannot accept the Defendant's argument on faith alone. *See*

*NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

The Defendants also argue that Singleton's protected activity was not a contributing factor in his discipline as Norfolk Southern acted in accordance with its well-established practices. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 12-15.) As to the March 2018 incident, the Defendants assert that discipline was justified after the FRA issued a violation and $5,000 fine for the broken ladder tread. (*Id.* at 14.) Singleton, however, responds with ample evidence of disparate treatment and retaliatory animus on the Defendants' part. For example, he testified that after he inspected the defective car, it was moved and taken off air for at least 24 hours before the FRA inspected it. (Singleton Dep. of Dec. 16, 2021, at 28:20-29:20.) Another carman, Davis, told Singleton that he had examined the same car's brakes after Singleton, but he was not charged with missing the broken ladder tread. (*Id.* at 30:6-31:10, 131:14-132:5.) In any event, because the car had been off air for 24 hours, Singleton believes that his inspection should no longer have been valid in the FRA's eyes. (*Id.* at 31:2-17.) Also, Singleton was the sole carman disciplined even though the FRA identified 17 other defects on the same visit. (Barnett Dep, Ex. U.) According to Collins, when Henson learned that Singleton had inspected the car with the broken ladder tread, he grinned and said, "The word

25

of the day is 'karma.'" (Collins Decl. at 2.) Collins attests that Henson was not interested in which carmen had examined the other faulty cars. (*Id.*) *See Lowery*, 690 F. App'x at 101 ("Comparator evidence is a particularly probative means for discerning whether a given adverse action was the product of a discriminatory motive." (citation and alterations omitted)). This evidence, when viewed most favorably to Singleton, defeats summary judgment on the contributing factor issue.

Turning to the April 2018 incident, the Defendants reason that it was appropriate to discipline Singleton for failing to follow company guidance when he improperly bad ordered a cracked coupler. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 13.) They emphasize that Henson tried repeatedly to educate Singleton on the differences between cracked couplers and hot tears using bulletin MDI-0021-GEN. (*Id.*) Yet again, Singleton responds with sufficient evidence to advance his case to trial. Compared to their previous confrontations, Singleton testified that he and Henson had a "knock-out drag-out" fight over this bad order tag. (Singleton Dep. of Dec. 16, 2021, at 55:25-56:9.) In Singleton's words, Henson was "cussing me up one side, down the other, fussing . . . . [H]e was belittling me and asking me if I even knew what I was doing and why was I . . . just randomly bad ordering cars." (*Id.* at 56:25-57:6.) As Singleton recalls, Henson threatened to fire him for refusing to remove the bad order tag. (*Id.* at 58:10-20.) Further, according to Singleton,

three other carmen at the Macon yard looked at the same coupler and agreed with Singleton that it should be bad ordered (although Barnett testified that two FRA inspectors found no defect in the coupler). (*Id.* at 61:11-62:20; Barnett Dep. at 183:23-185:19.) This evidence, the Court finds, creates a fact issue as to whether Singleton's protected activity contributed to the Defendants' decision to discipline him in April 2018.

Finally, the Defendants argue that Singleton's injury report and 2017 OSHA complaint are too distant from his March and April 2018 rule violations to support a retaliation claim. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 15.) According to the Defendants, both the Supreme Court and the Eleventh Circuit have found periods as short as three and four months to be an insufficient temporal connection to prove causation. (*Id.* at 16.) There are two problems with the Defendants' argument. First, on the record before the Court, Singleton does not rely exclusively (or even primarily) on his injury report and OSHA complaint as protected activity. Rather, he engaged in other protected activity in the months leading up to his discipline, including refusing to perform outbound inspections in a manner that he believed would violate federal regulations and bad ordering cars that he believed posed safety hazards.[4] Second, in the Defendants' cited authorities, the plaintiffs offered

---

[4] On reply, the Defendants argue that Singleton cannot use these (and other) actions as examples of protected activity because he failed to exhaust his administrative remedies with OSHA. (Reply Br. in Supp. of Defs.' Mot. for

*only* temporal evidence to create a causal link between their protected activity and the complained-of employment actions. *See, e.g.*, *Thomas*, 506 F.3d at 1364 ("[*I*]*n the absence of other evidence tending to show causation*, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." (emphasis added)); *Adams v. Cobb Cnty. School Dist.*, 242 F. App'x 616, 621 (11th Cir. 2007) ("*Absent evidence tending to link the events together*, the filing of the 1999 EEOC charge is simply too remote in time from the occurrence of the adverse actions to permit an inference of causation." (emphasis added)); *Thomas v. Richmond Cnty. School Dist.*, 2008 WL 4857521, at *11 (S.D. Ga. Nov. 6, 2008) ("Plaintiff relies almost solely on a temporal connection to prove causation, and a rather long span of time at that."). Here, by contrast, Singleton raises an inference of causation using not only temporal evidence but also Henson's own statements and comparator evidence.

---

Summ. J., at 12-13.) The Court declines to consider this new argument raised for the first time in a reply brief. *See, e.g.*, *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court." (quotation marks, citation, and alteration omitted)); *Boring v. Pattillo Indus. Real Estate*, 426 F. Supp. 3d 1341, 1349 (N.D. Ga. 2019) ("[T]he Court will not consider new arguments made for the first time in the reply brief.").

### 5. Good Faith

Next, the Defendants contend that Singleton's prima facie case of retaliation fails because he did not exhibit good faith in bad ordering cars. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 17.) Under the FRSA, when an employee reports a hazardous safety condition, it must be done "in good faith" to qualify as protected activity. 49 U.S.C. § 20109(b)(1)(A); *see also Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 780 (8th Cir. 2021). Citing two out-of-circuit district court decisions, the Defendants argue that a safety report must be both subjectively and objectively reasonable to satisfy the good faith requirement. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 18-19.) The Second and Eighth Circuits, however, have squarely rejected such an onerous definition of good faith. Instead, they held, the FRSA requires that an employee act "honestly and frankly, without any intent to defraud," to be protected. *Monohon*, 17 F.4th at 780 (citation omitted); *see also Ziparo v. CSX Transp., Inc.*, 15 F.4th 153, 155 (2d Cir. 2021) (concluding that "'good faith' as used in the FRSA requires only that the reporting employee honestly believe that what she reports constitutes a hazardous safety or security condition"). The Defendants offer no evidence to suggest that Singleton bad ordered couplers in February and April 2018 with anything but good faith intentions. Even the Defendants acknowledge that cracked couplers and hot tears "can be similar in appearance," and the record supports that Singleton may have correctly

identified a cracked coupler—over Henson's objections—in February 2018. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 17; Singleton Dep. of Dec. 9, 2021, at 75:7-16; Barnett Dep. at 160:7-162:20.) In sum, the Defendants plainly have not met the burden for summary judgment on this issue.

## C. Individual Liability

The Defendants also argue that Singleton cannot establish personal liability against the supervisors named in this case—Mason, Henson, and Moose. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 19-21.) Singleton makes no effort to respond to this argument, so the Court deems his retaliation claim abandoned as to those three Defendants. *See, e.g.*, *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed." (citation and alteration omitted)); *Sherk v. Adesa Atlanta, LLC*, 432 F. Supp. 2d 1358, 1374 (N.D. Ga. 2006) ("When a party does not respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (quotation marks and citation omitted)).

## D. Clear and Convincing Evidence

Even if Singleton can make out a prima facie case of retaliation, the Defendants argue that clear and convincing evidence shows that they would have taken the same action against Singleton absent his protected activity. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 22-23.) To be sure, employers

face a "steep burden" under the FRSA's burden-shifting framework: to meet the clear-and-convincing-evidence standard, "the employer must show that the truth of its factual contentions are highly probable." *Araujo*, 708 F.3d at 159, 162 (quotations marks and citation omitted). Accordingly, "this affirmative defense is often not suitable for summary judgment determination[.]" *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 793 (8th Cir. 2014). The following non-exclusive factors are relevant to this inquiry: (1) whether the employer has written policies addressing the alleged misconduct; (2) whether the employer followed applicable investigatory and disciplinary procedures; (3) the temporal proximity between the non-protected conduct and the adverse actions; (4) whether the employer consistently enforces the policies and rules at issue; and (5) the independent significance of the non-protected activity. *See Dafoe v. BNSF Ry. Co.*, 164 F. Supp. 3d 1101, 1115-16 (D. Minn. 2016).

The Defendants offer two pieces of evidence in support of their affirmative defense. First, the Defendants note that the wheel truck changes affected not only Singleton but also Garrett, who had not engaged in any protected activity. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 22 (citing Mason Dep. at 132:17-134:6).) However, viewed most favorably to Singleton, the fact that one other employee was also impacted by the alleged retaliatory act does not meet the Defendants' rigorous evidentiary burden. Second, as to the March 2018 discipline, the Defendants highlight that another employee at

31

Brosnan Yard, RB, was assessed the same deferred five-day suspension for missing a broken sill step in 2017. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 23.) The sole evidence for this claim is RB's heavily redacted Career Service Record with Norfolk Southern. Although the document lists a rule violation and deferred suspension on July 29, 2017, it says nothing about a broken sill step. (*Id.*, Ex. X at 1.) Rather, it uses an unintelligible code (at least to a layperson like the Court) to describe the three defects that RB failed to spot. (*Id.*) The Defendants do not cite any deposition testimony or other evidence to corroborate that the code in fact describes a broken sill step. So, the Court regards this evidence as neither clear nor convincing, as would be required to grant summary judgment.

### E. Punitive Damages

Finally, the Defendants contend that Singleton cannot recover punitive damages as a matter of law. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 23-24.) The FRSA authorizes punitive damages where "a railroad acted 'with malice or ill will or with knowledge that its actions violated federal law or with reckless disregard or callous indifference to the risk that its actions violated federal law.'" *Head v. Norfolk S. Ry. Co.*, 2017 WL 4030580, at \*18 (N.D. Ala. Sept. 13, 2017) (quoting *Pan Am Rys., Inc. v. U.S. Dep't of Labor*, 855 F.3d 29, 38 (1st Cir. 2017)).

The Court agrees with the Defendants that the evidence does not support an award of punitive damages as to the March and April 2018 incidents. Although Singleton testified that Henson berated and threatened to fire him, it was Moose and Barnett who made the decision to discipline Singleton for violating Norfolk Southern policies and federal regulations. (Barnett Dep. at 30:16-39:14; Moose Dep. at 55:6-56:2.) Before issuing each citation, Moose and/or Barnett conducted an independent investigation, held a conference with Singleton and his union representative, and offered Singleton the opportunity, per his union agreement, to initiate a formal investigation and hearing. (Barnett Dep. at 36:20-37:4, 183:23-185:19, 194:10-195:2; Henson Dep. at 137:11-22; Singleton Dep. of Dec. 16, 2021, at 45:18-46:1, 66:20-67:11.) In each case, Singleton voluntarily waived his right to challenge the discipline assessed. (Singleton Dep. of Dec. 16, 2021, at 48:24-49:8, 77:1-21.) In his response brief, Singleton offers no evidence or authority to suggest that these actions were taken with malice, ill will, or reckless disregard for his FRSA rights. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 29.)

The Defendants also argue that the wheel truck changes do not warrant punitive damages because they were being considered before Singleton's injury report. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 24.) Further, the Defendants emphasize that Singleton was able to bid into the modified wheel truck job when he returned to work. (*Id.* at 25.) As the Court discussed above,

33

though, it is not clear from the record whether and for how long Norfolk Southern had been reevaluating the two-person wheel truck position prior to August 2016. And Singleton's decision to accept the modified position does not negate whatever ill will or malice may have animated its creation in the first place. The timing of the changes and Garrett's declaration, the Court finds, are enough to advance Singleton's punitive damages request to a jury.

## IV.   Conclusion

For the foregoing reasons, the Defendants' Motion for Partial Summary Judgment [Doc. 87] is GRANTED in part and DENIED in part. Count Two of the Complaint may proceed against Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation but is dismissed as to Defendants Cortez Mason, Jonathan Henson, and Steve Moose.

SO ORDERED, this  3rd   day of February, 2023.

THOMAS W. THRASH, JR.
United States District Judge